Filed 5/14/24  P. v. Bunyad CA1/5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>          Plaintiff and Respondent,<br><br>v.<br><br>DARIUS BUNYAD,<br><br>          Defendant and Appellant. | A165881<br><br>(Sonoma County<br>Super. Ct. No. SCR-673191-1) |

Darius Bunyad, who worked as a chiropractor, appeals after a jury convicted him of six counts of felony sexual battery by fraud (Pen. Code, § 243.4, subd. (c)), one count of misdemeanor battery (*id.*, § 242), and six misdemeanor counts of annoying or molesting a child (*id.*, § 647.6, subd. (a)(1)).  Bunyad asserts claims of evidentiary and instructional error.  We find no error and affirm.

### BACKGROUND

#### A.

In October 2014, Jane Doe One was 16 years old and played high school basketball.  She started seeing Bunyad frequently— for chiropractic treatment of a torn shoulder tendon and spinal issues related to scoliosis and a (later) car accident.  At almost every appointment, Bunyad massaged Doe One's bicep, taped her

1

shoulder with kinesiology tape, and adjusted her spine, ribs, and neck.

Initially, Doe One's mother accompanied her to appointments. On those occasions, Bunyad left the treatment room door open, and Doe One remained clothed in her sports bra and tank top while he adjusted her. For rib adjustments, Bunyad stood behind Doe One, put his arms around her, felt her chest above and below her breasts, by placing his hands over her shirt and bra, to see if there any ribs were out of place. He then lifted her up as she leaned backwards and would "pop" her ribs back into place.

After Doe One got her driver's license (in November 2014), she went to appointments alone and Bunyad changed his methods. He began closing the door to the treatment room and, during rib adjustments, began to "grab" Doe One's breasts and "manipulate them" (still with his hand over her shirt and bra) in a way he said would help. After a few more visits, Bunyad told Doe One that it would make it easier if she took her sports bra off but kept her shirt on. She complied because she trusted Bunyad and thought the elastic from her bra might hinder treatment.

In May 2015, during a lunchtime appointment when Bunyad and Doe One were alone in the office, Bunyad asked her to take both her bra and shirt off. Believing that this would help Bunyad see an injury she had recently sustained during a basketball tournament, Doe One did what he asked despite feeling "really uncomfortable." While she was naked from the waist up, without a gown, Bunyad manipulated her shoulder and then offered her a job in his office. During this same appointment, Bunyad also performed a rib adjustment on Doe One. To do so, he stood behind Doe One, put his arms around her, grabbed her bare breasts and manipulated them for a couple minutes—purportedly so that they were "in the right spot" to "pop [her] ribs back in"—before lifting her up with his arms.

2

While doing so, Bunyad's pelvis touched her butt, and Doe One felt what may have been his erection. Doe One felt uncomfortable but did not say anything because they were alone, and she was scared.

Doe One started working for Bunyad in June 2015. As a benefit, she received free adjustments. During such adjustments, Bunyad treated her alone, with the door closed, and always had Doe One remove her shirt and bra (without giving her a gown). He also began to use a vibrating massager on her legs, butt, and lower back. On three or four occasions, Bunyad touched Doe One's vagina with the massager but acted as if it was accidental. He also told Doe One that her pectoral muscles seemed "tight," that her boyfriend must not have been touching her breasts enough, and that he could "take care of that" for her by massaging them. Doe One declined.

On September 25, 2015, Bunyad adjusted Doe One, at closing time, when they (again) were alone in the office. After he finished her standard rib adjustment, Bunyad placed his hands on Doe One's pelvic area (over her pants) close to her vagina— and asked her when she would turn 18. When Doe One told Bunyad her birthday, he said, "okay, I guess I can wait until then." Doe One immediately left and, that night, told her ex-boyfriend and her mother about Bunyad's age comment and touching of her pelvis.

The next morning, Doe One called Bunyad's office manager (J.H.) and quit. Doe One's mother later called and told J.H. that Doe One had been scared by an encounter with Bunyad. Doe One's therapist and school counselor reported her account to law enforcement.

Santa Rosa Police Department Detective Chris Diaz arranged for Doe One's mother to make a pretext phone call to Bunyad. A recording of the telephone conversation was played for the jury. During the call, Bunyad admitted touching Doe

One's breast, but stated he had not meant to make her feel unsafe or like he was "coming on to her." He also said it was common for him to have girls take their shirts and bras off for taping, that he did not know how many times he had Doe One do so, and that he "shouldn't have done [that] with her." Bunyad also told Doe One's mother that he "had more relations with men" and that it did not excite him to see Doe One naked. He also said, "I'm at your mercy" and that he wanted to see his three-year-old son grow up.

**B.**

Doe One provided Detective Diaz with Jane Doe Two's contact information. Diaz had spoken to Doe Two, in early 2015, regarding another complaint that had been made against Bunyad. When Diaz spoke with her again, in November 2015, she provided additional information that she had not previously shared. She also gave Diaz the names of Jane Does Six, Seven, and 12, who had also worked for Bunyad.

Bunyad was arrested on November 20, 2015. A few days later, the Santa Rosa Police Department issued a press release regarding the arrest. An article was published in the Press Democrat, which asked anyone with additional information to contact Detective Diaz. In response, Detective Diaz received calls from, among others, Jane Doe Four, Jane Doe Three's mother, Jane Doe Six, Jane Doe Seven, Jane Doe Eight, and Jane Doe 11.

**C.**

In August 2014, Doe Two, who was 15 years old, received treatment from Bunyad for a dislocated shoulder. After a few weeks of treatment, she accepted his offer to work as a receptionist and assistant in his office.

After she began working for him, Doe Two was no longer charged for her adjustments. Bunyad began sometimes telling Doe Two to take her shirt and bra off when she got her shoulder

4

taped (without giving her a gown).[1]  Bunyad also touched the bare skin between her breasts while doing rib adjustments.

During one treatment, while Doe Two was topless at his direction, Bunyad said she had "an ouchy on [her] nippy," pointed at her inverted nipple, and put his finger close to it (without touching).  On another occasion, Bunyad performed an ultrasound treatment on Doe Two's inner thigh and hip.  She had her pants pulled down to around her knees while Bunyad used the ultrasound machine on the area between her hip and groin.  Doe Two did not remember whether she was wearing underwear during the treatment but remembered being alone with Bunyad and feeling uncomfortable and awkward.  Doe Two quit her job with Bunyad in January 2015.

**D.**

Bunyad first treated Doe Three in October 2015, when she was 16 years old, after she had been in a car accident and injured her neck and shoulder.  Bunyad had Doe Three stand facing the wall, with her arms out.  Bunyad patted her on the shoulders and neck, then slipped his hand under her shirt and into her bra.  While Bunyad felt both of Doe Three's bare breasts, he asked her whether she had her period and said her breasts could feel more tender as a result.  She had never seen a chiropractor before, so she did not know whether the touching was a normal part of treatment.

Bunyad also told Doe Three to take off her shirt and bra so he could tape her shoulders.  He gave her a gown to wear, so she was covered in the front, but it was open at the back.  Doe Three's

---

[1] Doe Six, who was also working in Bunyad's office at the time, once helped him tape Doe Two's shoulder.  Doe Six corroborated Doe Two's account that Bunyad had Doe Two remove all her clothes from the waist up for this treatment.

boyfriend testified that, shortly after her appointment, Doe Three said Bunyad touched her breasts during the treatment.

### E.

Doe Four was 17 years old when she first saw Bunyad for chiropractic treatment, in the fall of 2013, after she dislocated a rib while wrestling. She saw him approximately once a week to have her shoulder taped and for rib or spine adjustments. When Bunyad taped Doe Four's shoulder, which he did at least 10 times, he had her take off her shirt and bra and she was not offered a gown to cover herself. This made Doe Four uncomfortable, but she thought it was a necessary part of her treatment.

Bunyad also told Doe Four that her pectoral muscles were tight. To purportedly help, Bunyad gave her between five and 10 treatments that involved Doe Four taking off her shirt and bra and lying (naked from the waist up) on a chiropractic table while he used a percussor massager on her pectoral muscles. During this treatment, Bunyad also sometimes used his hands to massage above her breasts. During one such treatment, when Doe Four was still 17 years old, Bunyad grabbed one of her breasts with his hands, commented that he was not performing an "official breast exam," and guessed her cup size.

During Doe Four's rib adjustments, Bunyad again had Doe Four remove her shirt and bra. He stood behind her, felt beneath her breasts, had her lean back, and then lifted her up. During this procedure, the back of Bunyad's hands sometimes contacted Doe Four's bare breasts. Bunyad pressed his body against her back and, on a few occasions, Doe Four felt what may have been his erection.

### F.

In December 2014, when she was 17 years old, Doe Six began working for Bunyad as a receptionist. Doe Two and Doe

6

Seven (who was Doe Six's aunt) also worked for him at the time. Doe Six described Bunyad as "overly friendly for a boss." He hugged his employees and slapped their butts.

Doe Six received approximately six back adjustments from Bunyad. During the adjustments, she remained fully clothed and stood with Bunyad behind her. He wrapped his arms around Jane Doe Six and "cup[ped]" her breasts with his hands, over her clothing. Doe Six thought it was a little weird, but initially thought it was okay because Bunyad was a doctor.

On her last day of employment with Bunyad, he performed a hip adjustment on her because her hip kept popping out of place. Bunyad had Doe Six lie on her back on the table. While he felt her hips, Bunyad pulled Doe Six's leggings and underwear down to where he could see her pubic area. Bunyad commented on a tattoo that she had in her pubic area, which was normally covered by her underwear. At this point, she knew Bunyad had pulled her leggings down "way too low" for an adjustment, got up, and left the room. Doe Six told Doe Seven, who was also working that day, what had happened. The two of them immediately left the office and then quit.

## G.

At the end of 2014, when she was 32 years old, Doe Seven started working for Bunyad as a receptionist. When she was hired, Bunyad told Doe Seven that she would receive free chiropractic care, a gym membership, and treatments with the "Zerona" cold laser machine. Doe Six and Doe Two also worked for Bunyad at the same time.

Doe Seven wanted to have the laser treatment on her thighs and hips. At her first treatment, Bunyad gave Doe Seven a robe, told her to "strip down" and to leave the front of the robe open "so he could do measurements." He specifically instructed her to take off her shirt and bra. Although this felt odd, Doe

7

Seven took all her clothes off as instructed, but left her panties on and the front of the robe open.  Bunyad used a measuring tape to measure her bare chest (underneath her robe).  In the process, he touched her breasts, including her nipples.

Bunyad also told Doe Seven that he could cure lactose intolerance with a rib adjustment.  He adjusted her ribs two or three times.  This involved Bunyad standing behind Doe Seven and reaching his arm around her to feel under her shirt and bra for the purportedly involved rib.  He cupped Doe Seven's bare breast with his hand and stuck his fingers under her rib cage, which caused her to fall backwards.  Bunyad caught her and helped her up with a hand on each of her breasts.

One day in December of 2014, Doe Seven was working while Doe Six received a hip adjustment from Bunyad.  After the treatment, Doe Six asked Doe Seven whether it was necessary for him to have pulled her pants down.  Doe Seven said it was not, they both left the office, and then quit the next day.

### H.

On September 12, 2015, 27-year-old Doe Eight, who had been diagnosed with cancer about nine months earlier and had undergone surgery and chemotherapy, went to Bunyad for treatment of pain in her neck and shoulders.  Bunyad said that his chiropractic adjustments could cure her cancer.

At her first appointment, Bunyad stood in front of Doe Eight and, using his hands and fingers, pushed on her pelvis directly above her vagina (over her clothes).  After he felt around her pelvis area for 30 to 45 seconds, Bunyad moved behind her, had her lean back, and cracked her back.  When she stood back up, he "spanked [her] butt" and made "a grunting sound."  While still standing behind her, Bunyad moved his left hand over her left shoulder, down her shirt, and under her bra.  Bunyad cupped Doe Eight's breast with his hand, which made her uncomfortable.

8

Just before she said something, Bunyad told her that she had "a breast bone out." He yanked Doe Eight's breast upward. Doe Eight heard a crack, which made her think Bunyad knew what he was doing.

Bunyad next had Doe Eight lie on her side on the table. He lay behind her in a "spooning position," intertwined his legs with hers, cracked her back, and made a grunting noise. Bunyad giggled and told Doe Eight that he was sorry but "sometimes it just like feels so good." He "smacked [her] butt" again and had her roll over to repeat this procedure on Doe Eight's other side.

Doe Eight told her sister what happened at the appointment but did not report the incident to law enforcement. About two months later, Doe Eight called Detective Diaz after her sister saw an article about Bunyad and urged her to call.

## I.

In 2012, when she was 27 years old, Doe 11 received chiropractic treatment from Bunyad for her back. She saw him approximately 11 times without anything unusual occurring. At an appointment in August 2012, Bunyad stood behind her and, after cracking her spine as usual, he put his hand into her shirt, under her bra, and touched Doe 11's nipple. She was shocked but said nothing—thinking maybe he had touched her nipple by mistake.

After a break, Doe 11 eventually returned for four additional adjustments. The first three times, nothing unusual occurred. However, before the fourth appointment, Doe 11 hurt her leg and hip in a fall. During the appointment, Bunyad had Doe 11 lie on her back on the treatment table and then moved her legs apart. Bunyad touched Doe 11's vagina over her clothing with three of his fingers.

Doe 11 immediately got up and left the office without saying anything. She did not report the incident because she was

9

embarrassed. In November 2015, Doe 11 saw a newspaper article about Bunyad's arrest, told her husband about what had happened to her, and contacted the police.

## J.

The People's expert in chiropractic medicine testified that it was not an appropriate chiropractic technique for a doctor's arms or hands to be on or across the patient's breasts during a rib adjustment. Instead, the patient's arms should be between the doctor's arms and the patient's breasts. Furthermore, it was inappropriate for a chiropractor's groin to touch a patient's back. The expert opined that a chiropractor would have no professional purpose for touching a patient's breast or nipple—either over or under clothing or with his hands or with a percussor massager. Similarly, there was no professional purpose for a chiropractor to touch a patient's vaginal area—either with his hands or with a massager—during a hip adjustment (or any other chiropractic treatment). Finally, the expert opined that there was no professional reason for a patient to be naked from the waist up without a gown.

## K.

One of Bunyad's office managers, H.E., testified that no patient had ever complained about Bunyad touching them inappropriately. Both J.H. and H.E., as well as another of Bunyad's employees, testified that occasionally a patient needed to remove her shirt and bra, but in such an instance the patient would be given a gown.

J.H. testified that she was working on Doe One's last day. When Bunyad treated Doe One at the end of the day, the door to the treatment room was open, and Doe One was wearing a gown.

## L.

The jury convicted Bunyad of six counts of felony sexual battery by fraud, one count of misdemeanor battery, and six counts of misdemeanor annoying or molesting a child. The trial court sentenced Bunyad to a total prison term of 10 years.

## DISCUSSION

### A.

Bunyad contends the trial court abused its discretion, and violated his due process rights, by admitting evidence of his prior misconduct with Does 12 and 13 under Evidence Code sections 1101, subdivision (b), and 1108.[2] He is wrong.

### 1.

Although evidence of prior bad acts is ordinarily inadmissible to show a defendant's disposition to commit such acts (§ 1101, subd. (a)), subdivision (b) of the statute creates an exception to this rule. "Evidence of prior criminal acts [or misconduct] is admissible 'when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge . . . ),' but not to prove the defendant carried out the charged crimes in conformity with a character trait." (*People v. Lewis* (2001) 25 Cal.4th 610, 636; accord, § 1101, subd. (b).)

The least degree of similarity with the charged offense is required to admit evidence of prior bad acts to prove intent or to negate accident or mistake. (*People v. Phillips* (2022) 75 Cal.App.5th 643, 672.) " 'For [such] purpose[s], the uncharged crimes need only be "sufficiently similar [to the charged offenses]

---

[2] Undesignated statutory references are to the Evidence Code. Additional evidence of uncharged misconduct was received from Jane Doe Nine. We do not provide any detail regarding Doe Nine's testimony because Bunyad does not challenge its admission.

11

to support the inference that the defendant ' "probably harbored the same intent in each instance." ' " ' " (*People v. Lewis, supra,* 25 Cal.4th at p. 637.) "To establish the existence of a common design or plan, the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 403.)

The analysis proceeds in two steps. Although admission under section 1101, subdivision (b), "does not require the conduct to be a crime, but rather applies more broadly to 'evidence that a person committed a crime, civil wrong, or other act,' " the trial court may first need to make a preliminary fact determination— i.e., "the fact that the conduct occurred and the defendant's connection to it." (*People v. Cottone* (2013) 57 Cal.4th 269, 286, fn. 10.)

Second, the trial court has discretion, under section 352, to exclude the evidence if its probative value is *substantially* outweighed by the probability that it will consume an undue amount of time or create a substantial danger of undue prejudice, confusion of issues, or misleading the jury. (§ 352; *People v. Avila* (2014) 59 Cal.4th 496, 515.) We review the trial court's section 352 determination for abuse of discretion. (*People v. Cordova* (2015) 62 Cal.4th 104, 132.)

**2.**

At trial, Doe 12 testified that she began chiropractic treatment with Bunyad in 2010, when she was 24 years old. They developed a friendship and saw each other socially outside of the office. In 2012 or 2013, after Bunyad moved his office and opened his own practice, he began to touch Jane Doe 12 inappropriately during treatments. Specifically, Bunyad touched and fondled her breasts when he taped her chest and when he performed rib adjustments. He also started pushing his erect penis against Doe 12's back during adjustments. Initially, his

touching was "quite subtle," and she assumed it was inadvertent because she trusted him.

Bunyad became more "overtly sexual" when Doe 12 started working for him, in September 2014, and she received free adjustments after her shifts. He stopped offering her a gown during treatments—leaving her completely topless during rib adjustments—and he would not remove his hands from her breasts when she asked. Eventually Bunyad became more aggressive and began requesting sexual favors when Doe 12 was getting adjustments—telling her, " 'I made you feel good so you can make me feel good.' " He put his mouth on Doe 12's breast three to five times and requested oral sex at least twice.

On the first occasion, Doe 12 was having cold laser treatment for breast reduction, which meant she was lying down (with her movement limited) and unclothed from the waist up. Bunyad then put his uncovered penis in her hands and on her face. Although she initially refused, she eventually performed oral sex on him. The second occasion was similar, but the machine was set up so that she "absolutely could not move." Doe 12 repeatedly told Bunyad "no," but he only raised the machine off her after she began performing oral sex.

In November 2014, Doe 12 reported Bunyad's inappropriate touching (and her performance of oral sex) during treatments to the Santa Rosa Police Department. Detective Diaz closed the case without referring it to the district attorney for possible filing of charges.

Doe 13 testified that, when she was 39 years old, she was treated by Bunyad after injuring her back and hip. Her treatments began appropriately, and she and Bunyad became friendly. After her usual treatment one day, when no one else was in the office, Bunyad offered to use a cold laser machine on Doe 13 to help her back and to lose "baby fat [and] any baby scars." She agreed, he told her to get undressed for the

13

treatment, and when Doe 13 asked him to leave the room while she undressed, he told her he was a doctor and had seen thousands of bodies. He finally left the room when she insisted. Doe 13 did not understand why she needed to be fully undressed and was uncomfortable, but she did as he asked because she trusted Bunyad.

During a subsequent laser treatment, Bunyad touched one of Doe 13's nipples. Bunyad then began fondling Doe 13's breasts at the beginning of her laser treatments, and then (on more than 10 occasions) rubbing her clitoris with his fingers—saying that this would help her heal by stimulating endorphins. She acted as though she enjoyed it and even faked an orgasm in the hopes of getting Bunyad away quickly. On other occasions, while massaging Doe 13's neck, Bunyad unzipped his pants, grabbed her hair, and pulled her face to his penis. She orally copulated him to leave.

On another occasion, when Doe 13's hip was hurting, he manipulated her hip joint and then rubbed his fingers inside Doe 13's vagina. She thought maybe his fingers had slipped while he was manipulating her joint.

Bunyad had vaginal intercourse with Doe 13 at least five times. On these occasions, she was already naked and restrained under the laser machine when Bunyad took off his clothes and got on top of her. In December 2014, Doe 13 reported Bunyad's inappropriate touching during treatments, including digital penetration, oral sex, and intercourse. Detective Diaz again closed the case without referring it to the district attorney for review.

**3.**

Before trial, the People filed a motion in limine to admit evidence of Bunyad's prior acts involving Does 12 and 13, claiming that such evidence was admissible under both sections

14

1101, subdivision (b), and 1108. Over defense counsel's section 352 objection—that the evidence was more prejudicial than probative—the trial court found the evidence admissible as to Bunyad's intent, lack of mistake or accident, and common plan under section 1101, subdivision (b). The trial court also admitted the evidence to show propensity to commit sex offenses under section 1108.

The trial court recognized the conduct involving Does 12 and 13 was more extreme, in some ways, than the evidence underlying the charged offenses—because the former involved oral copulation, sexual intercourse, and digital penetration. On the other hand, the trial court noted that the prior acts were nonetheless like the charged acts—as they all involved Bunyad's intimate touching of his patients during chiropractic treatments. The trial court further noted that many of the charged offenses involved minors, whereas Does 12 and 13 were adults. In that way, and because Does 12 and 13 had ongoing friendships with Bunyad, the uncharged conduct evidence was less inflammatory than the evidence supporting the charged offenses. Ultimately the trial court found that the probative value of the evidence, with respect to intent, absence of mistake, and common plan, outweighed its potential for prejudice.

**4.**

The trial court did not abuse its discretion in admitting the uncharged acts involving Does 12 and 13, under section 1101, subdivision (b).[3]

---

[3] Although we do not doubt the correctness of the trial court's decision under section 1108, we need not address it. (See *People v. Branch* (2001) 91 Cal.App.4th 274, 280-281 ["we would only find error in its admission if the testimony were inadmissible under both"].)

15

Bunyad only argues that the trial court abused its discretion by declining to exclude the evidence under section 352. He claims the evidence was insufficiently probative to outweigh its prejudice.  We agree with the trial court that the evidence of Bunyad's sexual conduct with Does 12 and 13 was highly probative of his intent at the time of the charged offenses.  "Evidence of intent is admissible to prove that, if the defendant committed the act alleged, he or she did so with the intent that comprises an element of the *charged* offense.  'In proving intent, the act is conceded or assumed; what is sought is the state of mind that accompanied it.' " (*People v. Ewoldt, supra*, 7 Cal.4th at p. 394, fn. 2, italics added and omitted.)

Here, both charged offenses required the prosecution to prove Bunyad acted with sexual intent.  (Pen. Code, §§ 243.4, subd. (c), 647.6, subd. (a)(1).)  "[T]o be guilty of sexual battery by fraud, the perpetrator must touch an intimate part of the victim for sexual purposes and, at the time of the touching, the victim must be 'unconscious of the nature of the act because the perpetrator fraudulently represented that the touching served a professional purpose.' " (*People v. Pham* (2009) 180 Cal.App.4th 919, 924, quoting Pen. Code, § 243.4, subd. (c).)  Annoying or molesting a child (Pen. Code, § 647.6, subd. (a)), requires conduct that would unhesitatingly irritate a normal person, which is motivated by " ' "an unnatural or abnormal sexual interest" ' " in the victim.  (*People v. Lopez* (1998) 19 Cal.4th 282, 289.)

Bunyad's intent as to these charges was put at issue when he pled not guilty.  (*People v. Memro* (1995) 11 Cal.4th 786, 864.)  In fact, in his supplemental opening brief, Bunyad concedes that his intent—whether he touched Does One, Three, Four, Six, Seven, Eight, and 11 to serve a professional purpose or for the specific purpose of sexual arousal or gratification—was the key contested issue at trial.  After all, in the pretext call regarding Doe One, Bunyad claimed that he was not excited by seeing Doe

One topless and that he was more attracted to men. This made Bunyad's conduct with Does 12 and 13 more probative to rebut his claims. (See *People v. Robbins* (1988) 45 Cal.3d 867, 879 [it is well established " 'that if a person acts similarly in similar situations, he probably harbors the same intent in each instance' " and "that such prior conduct may be relevant circumstantial evidence of the actor's most recent intent"].)

The probative value of the testimony from Does 12 and 13 was further heightened because each independently reported Bunyad's conduct to police mere months *before* the charged offenses against Doe One came to light. (See *People v. Balcom* (1994) 7 Cal.4th 414, 427 [probative value of uncharged offense evidence increased by close temporal proximity to charged offenses and when prior acts are reported without knowledge of other victims' claims of abuse].)

Bunyad's main objection to the admission of testimony from Does 12 and 13 appears to be based on its alleged dissimilarity to the evidence underlying the charged offenses. He focuses on Doe 12's and Doe 13's testimony regarding the ultimate acts of intercourse, oral copulation, and vaginal penetration—arguing that this makes the evidence unduly inflammatory. He misses the point. That his sexual conduct with two adult patients (Does 12 and 13) started with grooming behaviors that were remarkably similar to the charged offenses and then progressed to digital penetration, oral copulation, and sexual intercourse does not diminish the probative value of this evidence. Rather his unmistakably sexual conduct with Does 12 and 13 tends to suggest that (1) he was sexually attracted to females; (2) that his more ambiguous acts with Does One, Two, Three, Four, Six, Seven, Eight, and 11 were intended for his sexual arousal or gratification rather than for professional treatment purposes; and (3) that the touching that occurred in the charged offenses was not mistaken or accidental.

17

Furthermore, the trial court reasonably concluded that the uncharged misconduct was *not* more inflammatory and that there were sufficient similarities to support an inference that all three resulted from a common design or scheme. (See *People v. Shea* (1995) 39 Cal.App.4th 1257, 1268-1269, disapproved on other grounds by *People v. Dalton* (2019) 7 Cal.5th 166, 214.) Bunyad's conduct with *all* the Does began by him using his position of trust to view or touch their intimate body parts somewhat subtly under the guise of chiropractic treatment in his office. That Bunyad's conduct with Does 12 and 13 became more explicitly sexual (after the initial grooming stage) was relevant evidence from which it could be inferred that he was advancing according to a common plan or scheme.

True, the potential for prejudice is increased by the fact that the acts involving Does 12 and 13 did not result in any charges, much less a conviction. (See *People v. Merriman* (2014) 60 Cal.4th 1, 59 [jury might be inclined to punish defendant for uncharged acts].) But the risk of undue prejudice was limited by the evidence that Detective Diaz had concluded Bunyad's conduct with Does 12 and 13 was *not* criminal. This evidence might have benefited the defense—to the extent it suggested that the charged conduct might not be criminal.

Finally, we note that the risk of prejudice was further reduced by the court's instruction to the jury that it could not conclude from the evidence of uncharged acts involving Does 12 and 13 "that the defendant has a bad character or is disposed to commit crime" and the uncharged misconduct evidence "is not sufficient by itself to prove that the defendant is guilty of the crimes charged. The People still must prove every charge beyond a reasonable doubt." Juries are presumed to follow the instructions given. (*People v. Pinholster* (1992) 1 Cal.4th 865, 919, disapproved on other grounds by *People v. Williams* (2010) 49 Cal.4th 405, 458-459.)

18

The trial court did not abuse its discretion or violate Bunyad's due process rights in concluding that the evidence's probative value outweighed its potential for undue prejudice or delay.

**B.**

Bunyad also contends that the trial court committed instructional error in its response to a question the jury posed during deliberations.  We disagree.

**1.**

Penal Code section 1138 imposes a duty on the trial court to provide a deliberating jury with requested information on questions of law.  (See *People v. Lua* (2017) 10 Cal.App.5th 1004, 1016.)  But "[t]his does not mean the court must always elaborate on the standard instructions.  Where the original instructions are themselves full and complete, the court has discretion under [Penal Code] section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information." (*People v. Beardslee* (1991) 53 Cal.3d 68, 97.)

We review the trial court's decision whether to provide additional instruction for abuse of discretion.  (*People v. Waidla* (2000) 22 Cal.4th 690, 745-746.)  The correctness of any supplemental instruction presents a question of law that we review de novo.  (*People v. Doane* (2021) 66 Cal.App.5th 965, 980.) "[W]e view the challenged instruction in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner." (*People v. Houston* (2012) 54 Cal.4th 1186, 1229.)

**2.**

With respect to the evidence admitted from Does Nine, 12, and 13, the jury received two jury instructions.  First, the jury

19

was instructed, pursuant to CALCRIM No. 375: "You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant, in fact, committed the uncharged acts. . . . A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. [If the People have not met this burden, you must disregard this evidence entirely.] If you decide that the defendant committed the uncharged acts, you may, but are not required to, consider that evidence for the limited purpose of deciding whether . . . one, the defendant acted with the intent to touch . . . [the] Jane Does[] alleged in this case as victims for the specific purpose of sexual arousal or sexual gratification. And/or the defendant's conduct was motivated by an unnatural or abnormal sexual interest in Jane Does 1, 2, 3, 4, and 6. And the defendant's alleged actions were not the result of mistake or accident. And/or the defendant had a plan or scheme to commit the offenses alleged in this case. In evaluating this evidence, consider the similarity or lack of similarity between the uncharged offenses and the charged offenses. Do not consider this evidence for any other purpose. Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime. If you conclude that the defendant committed the uncharged offenses, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of the crimes charged. The People still must prove every charge beyond a reasonable doubt."

The jury was further instructed, pursuant to CALCRIM No. 1191: "The People presented evidence that the defendant may have committed the offenses with Jane Does 12 and 13 of digital penetration, oral copulation and vaginal penetration that were not charged in this case. And these crimes will be defined for you in these instructions. [¶] You may consider this evidence only if the People have proved to you by a preponderance of the evidence that the defendant, in fact, committed one or more of the

20

uncharged offenses of digital penetration, oral copulation or vaginal penetration. . . . A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. *If the People have not met this burden of proof, you must disregard this evidence entirely.* [¶] *If you decide that the defendant committed one or more of the uncharged offenses,* you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses. And based upon that decision also conclude that the defendant was likely to commit sexual battery by fraudulent representation and/or annoying or molesting a child as charged here." (Italics added.)

During deliberations, the jury asked the court: "If we believe by a preponderance of evidence that testimony of [Doe Nine], [Doe] 12, [and Doe] 13 is true, but don't believe by [a preponderance of evidence] that the uncharged acts ([forcible] sexual penetration, [forcible] oral copulation, rape) were committed, can we still use the testimony as evidence of intent of sexual arousal for example[?] [E].g. we believe [Doe] 13 and [Bunyad] had intercourse, but not necessarily that it was 'rape.'"

In response, the court told the jury (after proposing the response to the parties and receiving no objection): "[Y]es you may. [S]ee jury instruction #375."

**3.**

Despite defense counsel's failure to object to the trial court's response to the jury question, we (like the People) address Bunyad's argument on the merits. (See Pen. Code, § 1259; *People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012.)

Bunyad complains that the court's instruction was legally incorrect as applied to consideration of the evidence under section 1108 because section 1108 only permits use of a defendant's

21

uncharged "sexual offenses," as statutorily defined, to prove disposition. That may be so.

But the jury's question to the court did *not* ask for clarification on the use of the evidence to show disposition or propensity. The jury's question asked about consideration of the evidence for *intent* alone and made clear that it had already concluded that the People failed to prove by a preponderance of the evidence that Bunyad committed rape, forcible oral copulation, or forcible penetration. And the trial court had already instructed the jury, pursuant to CALCRIM No. 1191, that if the prosecution failed to prove by a preponderance of the evidence that Bunyad in fact committed one or more of these uncharged offenses, "you must disregard this evidence entirely. [¶] *If you decide that the defendant committed one or more of the uncharged offenses*, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses." (Italics added.)

The trial court properly answered the jury's question by affirming that if the jury believed Bunyad committed the uncharged acts, but that the acts did not constitute an enumerated criminal offense, it could nonetheless use the evidence of the uncharged acts to find that Bunyad had the requisite intent for the charged crimes. (See § 1101, subd. (b); *People v. McCurdy* (2014) 59 Cal.4th 1063, 1100 ["section 1101, subdivision (b), . . . is not limited to evidence of criminal conduct, but may encompass any wrong or other act"]; *People v. Cottone, supra*, 57 Cal.4th at p. 286, fn. 10 ["unlike section 1108, [section 1101, subdivision (b)] does not require the conduct to be a crime, but rather applies more broadly to 'evidence that a person committed a crime, civil wrong, or other act' "].)

On this record, it is not reasonably likely the jury—who only asked about considering the evidence to prove intent—understood the court's affirmative answer, including its reference

22

to CALCRIM No. 375, as applying to proof of disposition under CALCRIM No. 1191.  The trial court properly determined that further explanation was not required.

**DISPOSITION**

The judgment is affirmed.

BURNS, J.

WE CONCUR:

JACKSON, P.J.
CHOU, J.

*People v. Bunyad (A165881)*